UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | CRIMINAL NO.  03-10383-RGS |
| | ) | |
| | ) | |
| JULIO FRANCO | ) | |

**DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

Defendant, Julio Franco, moves this Court to suppress from the use in evidence any and all evidence derived from the unlawful search of a residence at 11 King's Hill Drive, Lynn, Massachusetts, by federal, state and local law enforcement officers from November 9, 2003 to November 10, 2003.

As grounds therefor, the search was executed in violation of the Fourth Amendment to the United States Constitution.

**STATEMENT OF FACTS: INVESTIGATING GOVERNMENT AGENTS**

The facts set forth in this section are taken from a Drug Enforcement Agency ("DEA") report of investigation dated November 14, 2003 by Special Agent Neil Doherty, the affidavit in support of the search warrant issued for 11 Kings Hill Drive written by Special Agent Mark Tully, and other law enforcement documents disclosed in discovery.

According to DEA investigative reports , at approximately 8:00 a.m. on November 9, 2003, surveillance had been set up at the 11 Kings Hill Drive address.  Law enforcement officers monitored Mr. Franco's activity throughout the day.  In addition, a Title III investigation had been authorized for this case and agents were monitoring what they believed to be Mr. Franco's cellular telephone calls.  The physical surveillance of Mr. Franco was continued until

about 7:00 p.m. on November 9, 2003 when agents lost contact with him after attempting to follow him. Surveillance of the 11 Kings Hill Drive address recommenced at about 10:30 p.m. that evening.

In between 7:00 p.m. and 10:30 p.m., agents arrested the co-defendants in this case, Domingo Vega and Jose Rafael Santiago, in Providence, Rhode Island. These arrests occurred after an alleged botched attempt by these individuals to purchase kilogram quantities of cocaine from an unknown supplier in Rhode Island. Mr. Franco's alleged participation in this scheme involved trading cars with one of these co-defendant's so that the car he was driving could be used to carry the cocaine purchased. Agents again set up surveillance at 10:30 p.m. at Kings Hill Drive in an attempt to arrest Mr. Franco if and when he returned to his home. A decision was made to enter the home at about 11:00 p.m. in order to secure the residence.

A group of approximately seven federal agents and police officers approached Franco's home and knocked on the door. Mr. Franco's wife, Nancy Rios Franco, answered the door and the officers told her that they had arrested her husband and the others and that they were going to get a warrant to search her home. The group of agents and officers entered the home and performed a "security sweep" of the premises. The only persons home were Mrs. Rios Franco and her two children. The officers attempted to get Mrs. Rios Franco to agree to cooperate as they informed her that her husband was the target of their narcotics investigation.

Agents asked Mrs. Rios Franco for permission to search the home and the two cars parked on the street that belonged to her and her husband. Ms. Rios Franco initially told them that her preference was to wait for the warrant to arrive before any search began. They told her

that the warrant would likely not be there until the next morning. In response she told them to search and "get it over with" and then signed a consent form.[1] The affidavit in support of the search warrant which eventually issued, written by S.A. Mark Tully, indicates that Mrs. Rios Franco "initially consented to a search of the apartment but then retracted her consent, stating that she wished to see a search warrant." See Exhibit A, Affidavit of Special Agent Mark Tully.

During the time that the agents were talking to Mrs. Rios Franco, the phone was ringing repeatedly. They allowed her to answer the phone after seeing that the number associated with the incoming call was a number used by Mr. Franco. She talked to him briefly in Spanish and then hung up the phone. The agents asked if he was coming home and she responded that she did not know.

Shortly thereafter, Mrs. Rios Franco was allowed to leave the apartment to take her children to her mother's home in Boston. Her car was searched before she and the children were allowed to leave. Before she left, she informed the agents that she wanted the search to proceed quickly but that she wanted to see a warrant. The agents informed her that she could consent to the search or that they could wait for a warrant. After some further discussion, the agents told her they would wait for a warrant at the apartment. Mrs. Rios Franco left and returned in about and hour with her brother.

At about 1:00 p.m. on November 10, 2003, a search warrant for the home was issued by a magistrate judge. When the warrant arrived at the apartment the agents seized a number of

---

[1] Defense counsel requested a copy of this signed consent form during the week of January 5, 2007 as he had not received it as a part of the government's initial discovery disclosure. Counsel received a copy of this form, via fax, on January 8, 2007 and has had an opportunity to review it with Mrs. Rios Franco.

pieces of evidence.  The most significant of these was a little over $180, 000.00 in cash which was discovered in a hidden compartment behind a kitchen cabinet.  No illegal narcotics or drug distribution paraphernalia were recovered.  Mr. Franco never returned to the home and so was not arrested.

## STATEMENT OF FACTS:   NANCY RIOS FRANCO

Nancy Rios Franco is the defendant's wife.  She, along with her two children, were at their home at 11 King's Hill Drive in Lynn on the night of November 9, 2003.  Representatives of the DEA, Massachusetts State Police and the Lynn Police arrived at her doorstep at about 11:00 p.m.  The defendant, Mr. Franco, was not home at this time.

Mrs. Rios Franco was summoned to her front door by loud knocking and an order to "Let us in!".  Mrs. Rios Franco opened the door to find herself face to face with 7-8 armed law enforcement officers.  They pushed past her and strode directly into her home; one of the officers stated they were there " to search".  They did not have a search warrant when they entered on November 9, 2003.  They told Mrs. Rios Franco and her children to sit in the living room and they were kept there under the watch of police officers.  The officers then engaged in a  subterfuge as they immediately informed Mrs. Rios Franco that they had arrested "everyone" including her husband due to their involvement in drug distribution.  They pressed her for information and she denied being involved in any criminal activity.  She wanted the officers to get out of her home as quickly as possible but she insisted on seeing a warrant authorizing them to search.

As this interrogation was taking place, other agents and police officers simultaneously commenced a search of the entire house. They tore through the home as they overturned mattresses in bedrooms and looked through closets, dresser drawers, kitchen drawers and cabinets. The officers had still not obtained or produced a search warrant. As the search progressed, officers continued to question Mrs. Rios Franco as they held her and the children in the living room. They told her she had "nothing to do" with the defendant's drug business and prodded her to cooperate. When she continued to refuse they then began harassing her by threatening to call the Massachusetts Department of Social Services ("DSS") to remove her children from the home; she felt intimidated and scared.

Mrs. Rios Franco eventually made a request that she be allowed to get the children dressed as they were in their sleeping clothes. They responded by again asking her if she knew anything about her husband's involvement in drug distribution and she again said she knew nothing. At some point, Mrs. Rios Franco realized that the officers had lied to her about her husband being arrested. While the search of the home and the questioning was going on, the telephone kept ringing and the officers finally told her to answer it. When she did answer the phone she realized that Mr. Franco was calling. She spoke to him briefly as the officers watched and listened and then she hung up.

After waiting for a while longer, the officers finally told her that she could get the children dressed and take them to a relative's home as she had originally suggested. The officers allowed her to leave with the children but they searched her car before letting them go. She again told them that she wanted them to do what they needed to do quickly but that she

wanted to see a warrant. Before leaving, she signed a consent form for the agents. As Mrs. Rios-Franco is a native Spanish speaker, she did not completely understand the import of what she was doing but felt she had no choice. She also felt pressured by the agents continued questioning and their threats to take her children away. Despite these overwhelming circumstances, she still had the strength to insist that they produce a warrant and she told them she would return after delivering her children to her relative. It took her about forty-five minutes to an hour to make the trip and return to the 11 King's Hill Drive address. She asked her brother to accompany her back to the apartment because she did not want to return alone.

      When she entered the home, she noted that the officers were walking around with a dog. She had never been asked if they could bring a dog into the house and was shocked and surprised as she had not given permission for this to occur. She also noticed that the apartment was in even greater disarray than when she left it. She had no idea what they did in her home in her absence. According to Mrs. Rios Franco, three to four officers had "made themselves comfortable" and were lounging in the living room. She also spotted three officers in the kitchen area. They asked who she had come back with and she told them that it was her brother. Although they had the dog in the house and were still looking about, they told Mrs. Rios Franco that they were still "waiting" for the search warrant to arrive. They told her and her brother to remain in the living room while in the apartment. During this time they again tried to threaten her by saying they were going to call DSS to take her children if she didn't talk and she again told them she had nothing to say.

It was not until the approximately 1-2:00 p.m. on November 10, 2003, that the warrant actually arrived on the premises. At that point in time, the officers had already done, what to Mrs. Rios Franco seemed, an extensive search of the entire home. This included the unauthorized use of a trained dog. Mrs. Rios Franco was in tears as she saw that the agents and officers had literally "destroyed" her home.

## ARGUMENT

1.  *The warrantless search of Mr. Franco's home was per se unreasonable and violated his Fourth Amendment rights.*

    a. *The agents exceeded the boundaries of a legitimate security sweep.*

In the absence of valid consent or exigent circumstances, warrantless searches are *per se* unreasonable and violate the Fourth Amendment. See, Steagald v. United States, 451 U.S. 204, 211 (1981). Indeed, the Supreme Court has, "consistently held that the entry into a home to conduct a search or make an arrest is unreasonable under the Fourth Amendment unless done pursuant to a warrant." Steagald, 451 U.S. at 211 (citing, Payton v. New York, 445 U.S. 573 (1980); Johnson v. United States, 333 U.S. 10, 13-15 (1948)).

In this case, the only justification that the officers initially possessed to perform something akin to a search of the apartment was a security sweep of the home to see who was present on the premises. In Maryland v. Buie, 494 U.S. 325 (1990), the Supreme Court held that "[a] 'protective sweep' is a quick and limited search of the premises, incident to an arrest and conducted to protect the safety of police officers or others." Id. at 327. A protective sweep

must be "narrowly confined to a cursory visual inspection of those places in which a person might be hiding," Id., and can last "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises," Id. at 335-36.

In this case, the officers had done extensive surveillance of the apartment for most of the day on November 9, 2003. They knew at 10:30 p.m. that Mr. Franco was not home based on their monitoring of his movements throughout the day and the information retrieved from the telephone intercepts. Although they did have the right to perform a quick sweep of the apartment to see who indeed was present, they did much more than that in Mrs. Rios Franco's estimation. The agents and officers immediately undertook an intensive search of the entire apartment that went beyond a visual inspection of places where a person could potentially hide. They did all of this before they had a warrant in hand to validate a full search the apartment.

   b. *The use of a drug sniffing dog during the agents occupation of the apartment resulted in an unreasonable seizure of the premises in violation of the Fourth Amendment.*

The United States Supreme Court has stated that securing a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of either the dwelling or its contents. Segura v. United States, 468 U.S. 796, 810 (1984). However, a seizure of premises reasonable at its

inception because based on probable cause may become unreasonable as a result of its duration or for other reasons. Id. at 812.

In this case, the seizure of the apartment occurred from approximately 10:50 p.m. on Sunday November 9, 2003 through at least 1:00 p.m. on Monday November 10, 2003 when the warrant physically arrived. A fourteen hour span is a long period of time but there is no indication that the agents purposely delayed securing a warrant. In addition, the majority of the fourteen hour period was literally overnight on a Sunday and it is reasonable to assume that no judicial officer was available during that period for consideration of a warrant request.

However, the agents did not simply "wait" for a warrant to arrive over that fourteen hour period. They exploited their lengthy presence in the apartment by bringing a drug sniffing dog into the home without Mrs. Rios Franco's authorization. This was done in bad faith on the part of the agents as they waited to bring the dog into the home until Mrs. Rios Franco left to deliver her children to a relative. One can infer that they utilized the dog in Mrs. Rios Franco's absence as she saw it in her home when she returned with her brother.

Under these circumstances, like the excessive "security sweep" that took place when the agents entered the apartment, the use of a trained narcotics canine constituted a warrantless search in violation of the Fourth Amendment. In United States v. Place, 462 U.S. 696, 707 (1983), the Supreme Court held that a dog sniff of luggage in an airport was not a search. The important factor in applying Place is whether - as in an officer's "plain view" observation of contraband - "the observing person or the sniffing canine are legally present at their vantage when their respective senses are aroused by obviously incriminating evidence." United States v.

Reed, 141 F.3d 644 (6th Cir. 1998).  Since Mrs. Rios Franco never consented to the presence or use of a drug sniffing dog in her apartment, any use of the dog by the agents would have constituted a search.  Cf.  United States v. Esquilin, 208 F.3d 315 C.A.1 (Me.), 2000 (occupants of hotel room did give voluntary consent for police and drug dog to be present in the room when dog alerted to narcotics therefore no "search" occurred).

2.      *Mrs. Rios Franco's alleged consents to the police's entry and search were an acquiescence to their claim of lawful authority and  the product of coercion.*.

According to the discovery materials provided by the government to defense counsel, the magistrate judge who issued the search warrant in this case was informed that Mrs. Rios Franco had initially consented to a search of the premises but that she retracted that consent.  The agents on scene had Mrs. Rios Franco sign a consent form but because she contemporaneously insisted on seeing an actual search warrant, they told her they were going to wait.  Moreover, there was an immediate retraction of any alleged consent.

Valid consent to a search provides an exception the Fourth Amendment's warrant requirement.  And in this case, the police claim they initially obtained Mrs. Rios Franco's consent to search her home.  But, "[w]hen a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given."  Bumper v. North Carolina, 391 U.S. 543,  548 (1968).  "This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority."  Bumper,

391 U.S. at 548-49 (no valid consent where police claimed they had a search warrant); See also, United States v. Perez-Montanez, 202 F.3d 434, 438 (1st Cir. 2000).

"Proof of valid consent requires that the prosecution show, by a preponderance of the evidence, that the consent was knowingly, intelligently, and voluntarily given." United States v. Marshall 348 F.3d 281, 285-86 (1st Cir. 2003) (citing, Perez-Montanez, 202 F.3d at 438). "Whether consent was voluntary or the result of coercion is a question of fact to be determined from an examination of the totality of the circumstances." Marshall, 348 F.3d at 286 (citing, United States v. Twomey, 884 F.2d 46, 51 (1st Cir. 1989)). "Factors to be considered include age, education, experience, knowledge of the right to withhold consent, and evidence of coercive tactics." Marshall, 348 F.3d at 286 (citing, Twomey, 884 F.2d at 51)); See also, United States v. Coraine, 198 F.3d 306, 309 (1st Cir. 1999).

The facts of this case indicate that Mrs. Rios Franco was immediately intimidated and coerced by the agents and officers who entered the home. The entry into the home was accomplished by officers who, by their conduct, conveyed the clear message that Ms. Rios Franco had no right to resist them. As soon as they came into the home they told her that they were there "to search". They huddled Mrs. Rios Franco and her two children into the living room , under police guard, and did not allow them to move about the house freely. The agents and officers immediately swept through the entire home in a torrent literally taking it apart. While seated in the living room the agents interrogated Mrs. Rios Franco, in her children's presence, and pressed her for information on her husband or her knowledge of his allged drug business. Interspersed throughout this interrogation were repeated threats on the part of the

agents to call DSS and have the children removed from the home if cooperation was not forthcoming.

Mrs. Rios Franco's alleged written consent was given after all of this took place and the agents finally relented and allowed her to get her children dressed so she could get them to her relative's house. She personally had been subjected to the coercive tactics of the officers, and had witnessed them assume total control over her home. The officers made a point of lying to her by telling her that the defendant had been arrested. They threatened her family's well-being by suggesting that a failure to cooperate could jeopardize her control over her children. Under these circumstances, Mrs. Rios Franco reasonably believed that a refusal to consent and sign the form would be a "futile gesture." See United States v. Weidul, 325 F.3d 50 (1st Cir. 2003).

Because this alleged written consent was not voluntary, the government has failed to meet its burden of showing a consent exception to the warrant requirement in this case.

### REQUEST FOR EVIDENTIARY HEARING

Mr. Franco requests an evidentiary hearing on this Motion and reserves the right to modify it and/or file supplemental pleadings in response to submissions by the government.

JULIO FRANCO
By his attorney,

/s/ Oscar Cruz, Jr.

Oscar Cruz, Jr.
 B.B.O. #630813
Federal Defender Office
408 Atlantic Avenue, 3rd Floor
Boston, MA  02110
Tel: 617-223-8061

## CERTIFICATE OF SERVICE

    I, Oscar Cruz, Jr., hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on January 10, 2007.

                                        /s/ Oscar Cruz, Jr.

                                        Oscar Cruz, Jr.